UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

EXPREZIT CONVENIENCE STORES, LLC    )
and EXPREZIT MONEY ORDERS, LLC,     )
                                    )
    Plaintiffs/Counter-defendants,)
                                    )
       v.                          )    No. 3:05-CV-0945
                                    )    Judge Echols
TRANSACTION TRACKING TECHNOLOGIES,  )
INC.,                               )
                                    )
    Defendant/Counter-plaintiff.    )

### MEMORANDUM

    Pending before the Court is the Motion for Partial Summary Judgment (Docket Entry No. 75) filed by Plaintiffs/Counter-defendants Exprezit Convenience Stores, LLC and Exprezit Money Orders, LLC (collectively "Exprezit"). Also pending is the Motion for Partial Summary Judgment (Docket Entry No. 72) filed by Defendant/Counter-plaintiff Transaction Tracking Technologies ("3T"). Both Motions have been fully briefed by the parties. (Docket Entry Nos. 73, 76, 84, 93, & 95).

### I.  FACTUAL BACKGROUND

    This is a breach of contract action (with other state law claims) arising out of Plaintiffs' inability to secure a bond so that Plaintiffs could operate as a licensed money transmitter. The facts underlying the dispute are as follows.

    Exprezit operates a chain of convenience stores that sell money orders. 3T is a Tennessee company that provides computer

1

equipment and support services necessary to enable convenience store operators to establish themselves as money transmitters.

3T and Convenience USA (the predecessor of Exprezit) began discussing the possibility of 3T providing equipment and support for Convenience USA's use in the money transmitting business. On March 19, 2003, Jeff Keith, 3T's Chief Operating Officer, sent an e-mail to Convenience USA stating:

> I wanted to reiterate that we have never had any client of ours turned down for a bond or state money order license. In order to help your comfort level on the licensing and bonding, I am going to send to you tomorrow an addendum to the contract clearing [sic] stating that if for ANY reason Convenience USA is unable to obtain a license and/or bond that the down payment is fully refundable.

(Docket Entry No. 97-16). At some point,[1] Keith also presented Exprezit with a summary of 3T's system which stated:

Money Order Program

> Exprezit!: Any viable corporation in the United States can apply for and obtain a license to sell their own money orders. It is a very similar process to obtaining a liquor license.
> *          *          *
> Initial Set-Up
> *          *          *
> In order for a company to obtain a license in each state it must have a minimal net worth and audited financial statements. All of 3T clients have been able to obtain a money order license (no one has ever been turned down). Exprezit operates 4 sites in Alabama, 60 in Florida, 42 in Georgia and 30 in North Carolina. The

---

[1]It is unclear as to when this document was prepared and delivered to Exprezit. However, Exprezit asserts that prior to the execution of any agreement between the parties the same or substantially similar representations were made by 3T to Exprezit.

2

> total required net worth for all of these states is
> $395,000 in tangible net worth. This could be achieved by
> setting up the company and   transferring the assets
> (this could be any assets) to the new corporation.

(Docket Entry No. 78-1).

On May 12, 2003, Exprezit and 3T entered into a Systems Proposal ("Agreement") and Amendment ("First Amendment") in which Exprezit agreed to purchase hardware, software, equipment and services from 3T, so that Exprezit could begin selling money orders itself, rather than paying a third-party vendor to process the money orders. In the Agreement, Exprezit expressly agreed that 3T's liability was limited to the amount paid under the Agreement, and that in no event would 3T be liable for lost profits or any other incidental, consequential, or special damages. Exprezit paid 3T $224,672, which was fifty percent of the purchase price of the 3T system.

The Agreement contains an integration clause which states:

> This Agreement sets forth the entire agreement and
> understanding of the parties relating to the subject
> matter herein and merges all prior discussions between
> them.  No modification or amendment of this Agreement,
> nor any waiver of rights under this Agreement will be
> effective unless in writing signed by both parties.

(Docket Entry No. 86-1, Agreement ¶ 11(d)).

After the parties executed the Agreement and First Amendment, there was some delay in the licensing and bonding process because Exprezit could not produce audited financial records.  Exprezit

attributes this to the fact that it acquired the convenience stores from Convenience USA's bankruptcy estate in March of 2003.

On July 14, 2003, 3T informed Exprezit that it had been informed by The Horton Group, a company which provides risk management services to businesses, that the Horton Group's normal underwriter would not write the bond but that it had a bond specialist it would confer with in the hope of finding somewhere to place the bond. On July 24, 2003, 3T informed Exprezit that The Horton Group had not yet been able to locate a bond and that Zurich and Ohio Casualty, two bond underwriters, had turned down the request. (Docket Entry No. 78-6).

On August 14, 2003, The Horton Group described bonding for Exprezit as a "long shot" and mentioned the possibility of placing the bond with collateral in the form of a 100% irrevocable line of credit and acknowledged that "doesn't do the client much good" since the client had to put up cash or collateral. (Docket Entry No. 78-7). On September 10, 2003, The Horton Group informed Exprezit that a third underwriter, Travelers would not underwrite the bond. In transmitting that news, the Horton Group noted that Exprezit's "financials aren't strong enough yet to support these bonds" and while the Horton Group would continue to look it was "not very encouraged." (Docket Entry No. 78-8).

In an attempted solution to the problem of not being able to secure a bond, 3T, in early 2004, suggested that Exprezit create

4

another entity, totally separate from Exprezit, which could be licensed and bonded.[2]  Exprezit agreed with this suggestion and created EMO New Mexico which was capitalized with a $500,000 note receivable from General Distributors, Inc. ("GDI"), a grocery distribution company.[3]  While 3T claims the capitalization was "a contrivance of form over substance," it admits that $500,000 was the amount that 3T considered appropriate capitalization and that an audit by a Certified Public Accountant stated that Exprezit had a net worth in excess of $500,000.

After EMO New Mexico was formed, it obtained a New Mexico Certificate of Good Standing and submitted applications to do business in Florida, Georgia, Alabama and North Carolina.  It also began preparing draft money order license applications for the various states.

In July 2004, Exprezit, EMO New Mexico and 3T entered into a Second Amendment to the Agreement pursuant to which EMO New Mexico would be "responsible for attempting to qualify as a licensed and bonded Money Transmitter" while Exprezit retained the obligation to pay 3T.  Several provisions of the First and Second Amendments related to qualifying as a licensed and bonded Money Transmitter.

---

[2]The thought was that a company independent from Exprezit would not have the taint of the bankruptcy which had been filed by Convenience USA and from which Exprezit sprung.

[3]The primary owner of both Exprezit and GDI is the same.

The First Amendment provided:

> 1. [Exprezit] will not be bound to the terms of the Contract unless it is approved as a licensed and bonded Money Transmitter Business in the states in which it operates its convenience stores.
> 2. [Exprezit] will be reimbursed its initial payment as stipulated on the Contract within 30 days of the notification that it has not been approved as a licensed and bonded Money Transmitter as described in (1) above.

(Docket Entry No. 78-4). The Second Amendment states in pertinent part:

> 1.2 Designation of Exprezit Money Orders. [EMO New Mexico], rather than [Exprezit], shall be the entity under the Agreement that shall attempt to qualify as a licensed and bonded Money Transmitter. If [EMO New Mexico] qualifies as a Money Transmitter, [Exprezit] shall fulfill its payment and other obligations under the Agreement[.]
>
>        *              *             *
>
> 1.4 The First Amendment Applies to Exprezit Money Orders. The provisions of the First Amendment apply to [EMO New Mexico]. Thus, if EMO New Mexico is not approved as a licensed and bonded Money Transmitter in the Required States, then Vendor shall refund to [Exprezit] the initial payment within 30 days of the notification that [EMO New Mexico] has not been so approved.

(Docket Entry No. 78-9).

In August 2004, less than a month after the execution of the Second Amendment, Bonds Southeast, a bond brokerage firm that 3T recommended to Exprezit, informed EMO New Mexico that it found two sureties willing to write all of the bonds EMO New Mexico needed immediately. However, the underwriting of the bonds was contingent upon EMO New Mexico providing a $750,000 Irrevocable Letter of Credit (the "ILOC").

6

A lender treats an ILOC request like a request for a loan. In this case, the ILOC would serve as a financial mechanism that would obligate the lender to pay if EMO New Mexico failed to pay. EMO New Mexico had only two assets that it could offer as security, the $500,000 GDI note, and receivables of less than $5,000.

EMO did not accept the bond, nor did it take the steps necessary to determine what, if anything, would have been required to obtain the ILOC. While 3T admits a lender would not have provided an ILOC to EMO New Mexico, a newly formed entity with a low net worth, without requiring security, it claims that EMO New Mexico could have acquired bonds split into smaller denominations for the licensing in each state (rather than one aggregate bond).

3T claims that it continued to work to assist Exprezit[4] in finding bonds on more favorable terms for EMO New Mexico, including investigating the possibility of having more than one bonding company underwriting the bond. Exprezit denies that claim and instead asserts that by August 24, 2004, efforts to find bonding which did not require an ILOC had been exhausted. By letter dated September 23, 2004, Exprezit demanded a refund of the initial payment of $224,672.00. The refund was never provided and this lawsuit ensued.[5]

---

[4]Overall, the time value of the services 3T provided was $29,920.

[5]Exprezit filed suit in the Circuit Court of Walton County, Florida. After the case was removed to the United States District

7

In its Second Amended Complaint, Exprezit alleges breach of contract (Count I) because of 3T's failure to refund the initial payment or alternatively that 3T has been unjustly enriched (Count II) by keeping the initial payment. Exprezit also alleges it is entitled to recover under a theory of promissory estoppel (Count III). Exprezit further alleges that 3T engaged in misrepresentation (Count IV) by falsely stating the ease by which Exprezit could become licensed and bonded. Finally, Exprezit brings a claim under the Tennessee Consumer Protection Act (Count V[6]). 3T generally denies the allegations in the Second Amended Complaint and has filed a Counterclaim for breach of contract (Docket Entry No. 51).

The parties have filed cross-motions for partial summary judgment. Both motions are directed to the contention that the other side to the Agreement and Amendments breached the contract between the parties. In addition, 3T has moved for summary judgment on Exprezit's other claims.[7]

_____

Court for the Northern District of Florida, it was transferred to this Court.

[6]This is mislabeled in the Second Amended Complaint as a second "Count IV."

[7]Though the motions are for partial summary judgment, Exprezit notes that were it to prevail on its motion, the entire case could be disposed of because it would non-suit its remaining claims. 3T asserts that if its motion is granted, the sole remaining question would be the amount of damages it has suffered as a result of the breach of contract, as well as the amount of attorney's fees.

8

## II.  **STANDARD OF REVIEW**

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In

9

ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. LEGAL ANALYSIS

### A. Breach of Contract Claim and Counterclaim

Exprezit asserts it is entitled to prevail on its breach of contract claim while 3T claims it is entitled to prevail on its breach of contract counterclaim. The parties' arguments on the breach of contract issue will be addressed after a review of the relevant standards governing this Court's interpretation of the Agreement and Amendments.

### 1. Standards Governing Construction of a Contract

The rules underlying construction of a contract are well-known. The Tennessee Supreme Court recently reviewed the principles governing the construction of contracts as follows:

> A cardinal rule of contract interpretation is to ascertain and give effect to the intent of the parties. Christenberry v. Tipton, 160 S.W.3d 487, 494 (Tenn. 2005). In interpreting contractual language, courts look to the plain meaning of the words in the document to ascertain the parties' intent. Planters Gin Co. v. Fed. Compress & Warehouse Co., 78 S.W.3d 885, 889-90 (Tenn. 2002). Th[e] Court's initial task . . . is to determine whether the language is ambiguous. Id. at 890. If the language is clear and unambiguous, the literal meaning controls the outcome of the dispute. Id. If, however, the words in a contract are susceptible to more than one reasonable interpretation, the parties' intent cannot be determined by a literal interpretation of the language. Id.

Contractual language "is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one." <u>Farmers-Peoples Bank v. Clemmer</u>, 519 S.W.2d 801, 805 (Tenn. 1975)[.]

When contractual language is found to be ambiguous, the court must apply established rules of construction to determine the intent of the parties. <u>Planters Gin Co.</u>, 78 S.W.3d at 890. An ambiguous provision in a contract generally will be construed against the party drafting it. <u>Hanover Ins. Co. v. Haney</u>, 221 Tenn. 148, 425 S.W.2d 590, 592 (1968); <u>Vargo v. Lincoln Brass Works, Inc.</u>, 115 S.W.3d 487, 492 (Tenn. Ct. App. 2003). Furthermore, when a contractual provision is ambiguous, a court is permitted to use parol evidence, including the contracting parties' conduct and statements regarding the disputed provision, to guide the court in construing and enforcing the contract. <u>See</u>, <u>Memphis Housing Auth. v. Thompson</u>, 38 S.W.3d 504, 512 (Tenn.2001).

<u>Allstate Ins. Co. v. Watson</u>, 195 S.W.3d 609, 611-12 (Tenn. 2006). Applying these rules to the facts of this case, the Court determines that there are factual questions relating to the breach of contract claim and counterclaim which preclude the entry of summary judgment in favor of either party.

**2. Exprezit's Motion Regarding Breach of Contract**

The basis of Exprezit's Motion for Partial Summary Judgment on its breach of contract and 3T's counterclaim can be stated succinctly. Exprezit claims that it is entitled to judgment in relation to the Agreement and Amendments because it simply did not obtain the licenses or bonds which were required for it to operate as a money transmitter.

In support of its argument, Exprezit asserts that the Agreement and Amendment are unambiguous. It points to paragraph 1.2 of the First Amendment which provides that "Exprezit will not

11

be bound to the terms of this Contract unless it is approved as a licensed and bonded Money Transmitter Business" and paragraph 1.4 of the Second Amendment which provides that if Exprezit "is not approved as a licensed and bonded Money Transmitter in the Required States, then Vendor shall refund . . . the initial payment within 30 days of the notification that Exprezit . . . has not been so approved."

Those clauses do in fact support the suggestion that if Exprezit did not become bonded and licensed, its obligations under the contract ceased, and it was entitled to a refund of its initial payments. But "[c]ontracts must be read in their entirety," <u>Paul v. Insurance Co. of North America</u>, 675 S.W.2d 481, 483 (Tenn. App. 1984), and "a contract's provision must be interpreted in the context of the entire contract." <u>D & E Constr. Co. v. Robert J. Denley, Co.</u>, 38 S.W.3d 513, 519 (Tenn. 2001).

In this case, the Second Amendment required Exprezit to attempt to qualify as a licensed and bonded money transmitter and also required it to "perform all acts reasonably required to effect the purposes of" the Agreement and to refrain from engaging "in activity that reasonably prevents the other party from enjoying the benefits of" the Agreement. (Second Amendment at 1 & ¶ 2.5). Under this language, Exprezit was not free to do nothing in regard to obtaining bonding and still be entitled to a refund of the monies it had paid. It had to act reasonably, both under the terms of the

12

Agreement and under the legal principle that "[i]n Tennessee, the common law imposes a duty of good faith in the performance of contracts." Wallace v. Nat'l Bank of Commerce, 938 S.W.2d 684, 686 (Tenn. 1996). Hence, it cannot be said that merely because Exprezit did not become bonded and licensed, it is entitled to prevail under the terms of the contract.

In reaching this conclusion, the Court is mindful of Exprezit's additional argument that it would have been futile for it to apply for the ILOC. While "[t]he law should not require one to perform useless or futile acts," Richardson v. Tenn. Bd. of Dentistry, 913 S.W.2d 446, 448 (Tenn. 1995), it is not clear that Exprezit would have necessarily been turned down and 3T has presented evidence that Exprezit did not even take the steps necessary to determine what, if anything, would have been required in order to obtain the letter of credit. In fact, the evidence presented on the summary judgment record could be viewed as showing that while Exprezit and 3T were working to split the bonds, Exprezit backed out of the deal. Whether Exprezit acted reasonably is a jury question.

### 3. 3T's Motion Regarding Breach of Contract

In a two-page argument, 3T contends it is entitled to judgment on Exprezit's breach of contract claim and on its breach of contract counterclaim by repeatedly stating that Exprezit was required to, but did not "take all steps" necessary to become a

13

licensed and bonded money transmitter. Because of that, 3T asserts
Exprezit breached the contract.

As 3T points out, "'there can be no recovery for damages on
the theory of breach of contract by the party who himself breached
the contract." United Brake Sys. Inc. v. American Environmental
Protection, Inc., 963 S.W.2d 749, 756 (Tenn. Ct. App.
1997)(citation omitted). That is, "[a] party who materially
breached a contract is not entitled to damages stemming from the
party's later material breach of the same contract." Id.

While it may be true that Exprezit was offered the necessary
bonds and that Exprezit refused to accept the bonds and did not
apply for the licenses necessary to become a money transmitter, it
does not follow, as 3T asserts, that 3T is entitled to judgment on
a breach of contract claim and Exprezit is not. This is because
the underlying premise of 3T's argument is wrong. While it asserts
"the parties' contract required [Exprezit] to take all steps
required to become a licensed and bonded money transmitter,"
(Docket Entry No. 8 at 73), this is not what the Agreement or
Amendments say, even that portion cited by 3T. What the cited
language in the Second Amendment states is that Exprezit "shall
attempt to qualify as a licensed and bonded Money Transmitter" and
that Exprezit will "'perform all acts reasonably required to effect
the purposes' of the Agreement." Id. (quoting Second Amendment
¶¶ 1.2 & 2.5).

14

Attempting to qualify and performing all reasonable acts is far different from having to "take all steps necessary." What is reasonable under these circumstances is open to interpretation. Where a contract provision is "susceptible to more than one reasonable interpretation, and the parties' intent cannot be determined by a literal interpretation of the language or pertinent rules of construction, the legal meaning of the contract becomes a question of fact." Humphrey v. Tomkats, Inc., 2006 WL 2285806 at *4 (Tenn. Ct. App. 2006).

Exprezit has presented evidence suggesting it took various steps in an effort to obtain the necessary bond and licenses. Those steps included (1) forming a subsidiary; 2) obtaining certificates of authority to do business in the various states where Exprezit had stores; 3) preparing draft money order license applications and delivering them to 3T (and subsequently revising the draft applications per 3T's suggestions); 4) preparing a money order business plan; and 5) reaching out to the bond broker recommended by 3T, The Horton Group, and providing it with requested financial information. Whether those efforts were reasonable under the circumstances is a question of fact and not susceptible for determination as a matter of law.

15

**B.  Exprezit's Remaining Claims**

    **1.  Unjust Enrichment**

Unjust enrichment is a contract implied-in-law in which a court may impose a contractual obligation where one does not exist. <u>Whitehaven Community Baptist Church v. Holloway</u>, 973 S.W.2d 592, 596 (Tenn. 1998).  "Such contracts are not based upon the intention of the parties but are obligations created by law and are 'founded on the principle that a party receiving a benefit desired by him, under the circumstances rendering it inequitable to retain it without making compensation must be so.'"  <u>Duke v. Browning-Ferris Indus.</u>, 2006 WL 1491547 at * 9 (Tenn. Ct. App. 2006)(quoting <u>Pashall's, Inc. v. Dozier</u>, 407 S.W.2d 150, 154 (Tenn. 1966)).  "Courts will impose a contractual obligation under an unjust enrichment theory when: (1) there is no contract between the parties or a contract has become unenforceable or invalid; and (2) the defendant will be unjustly enriched absent a quasi-contractual obligation."  <u>Whitehaven</u>, at 596.

In this case, Exprezit admits that its unjust enrichment claim is an alternative theory to its breach of contract claim.  "[T]he equitable remedy of unjust enrichment cannot be imposed where . . . a valid contract exists on the same subject matter."  <u>Duke</u>, 2006 WL 1491547 at *10.  Nevertheless, summary judgment is not appropriate because under the First Amendment, Exprezit is not bound to the terms of the contract unless it is approved as a licensed and

16

bonded Money Transmitter. Conceivably, a jury could determine that, under the contract itself, Exprezit was not bound by its terms and that it is therefore entitled to damages to the extent 3T has been unjustly enriched. Accordingly, summary judgment is not appropriate on Exprezit's unjust enrichment claim.

### 2. **Promissory Estoppel**

Promissory estoppel has been described as "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee . . . , and which does induce such action or forbearance, is binding if injustice can be avoided only by enforcement of the promise. <u>Calabro v. Calabro</u>, 15 S.W.3d 873, 878 (Tenn. Ct. App. 1999). Thus, "[w]here one makes a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, and where such promise does in fact induce such action or forbearance, it is binding if injustice can be avoided only by enforcement of the promise." <u>Wilson v. Smythe</u>, 2004 WL 2853643 at *10 (Tenn. Ct. App. 2004). To prevail on such a claim, plaintiff must show not only a promise, but also reasonable reliance on the promise to the detriment of the plaintiff. <u>Id</u>.

In this case, Exprezit points to the e-mail from Keith of 3T in which he states that none of 3T's clients had been turned down for a bond or state license and that in order to help the "comfort

17

level" he was sending an "addendum to the contract clearing [sic] stating that if for ANY reason that Convenience USA is unable to obtain a licence and/or bond that the down payment is fully refundable." (Docket Entry No. 68-4).

Whether Keith's e-mail induced Exprezit to provide the initial payment and whether Exprezit acted reasonably under the circumstances obviously presents a question of fact for the jury.

In moving for summary judgment, 3T claims that Exprezit cannot prevail on this claim in light of the integration clause, the statute of frauds and the parol evidence rule. This Court disagrees.

The integration clause found in paragraph 11(d) does not bar Plaintiff's promissory estoppel claim. "The principle of integration embodies the rule that all prior statements or negotiations are merged into a written contract intended by the parties to be a complete expression of their agreement." Loew v. Gulf Coast Develop. Inc., 1991 WL 220576 at *5 (Tenn. Ct. App. 1991). However, "it should not be used to restrict the scope of the proof with regard to [a] . . . fraudulent inducement claim." Id.[8]

---

[8]3T's reliance on T.C.A. § 47-50-112 for the proposition that contracts are to be enforced as written is misplaced. While the statute indicates that contracts are "presumed to contain the true intention of the parties and shall be enforced as written," the statute goes on to provide that "nothing herein shall limit the right of any party to contest the agreement on the basis it was procured by fraud or limit the right of any party to assert any

18

Nor is the promissory estoppel claim barred by the statute of frauds or the parol evidence rule, as argued by 3T. While "parties cannot use parol evidence to vary the terms of a written contract, . . . neither the parol evidence rule nor the statute of frauds prevents the use of parol evidence to enter into a contract claim." Id. In any event, Keith's e-mail was in writing and if it were viewed as an oral contract, the partial performance of Exprezit in making the initial payment takes the contract out of the operation of the statute of frauds. Frankenbach v. Rose, 2004 WL 221319 at **13-14 (Tenn. Ct. App. 2004). Summary judgment will not be granted on the promissory estoppel claim.

**3. Misrepresentation**

Exprezit presents assorted evidence in support of its misrepresentation claim. This evidence includes the e-mail from Keith in which he represents that the initial payment will be refunded if "for ANY reason" Convenience USA is not licensed and bonded, as well as his summary of 3T's system which promoted the financial benefits associated with 3T's system, indicated that obtaining licenses for selling money orders was akin to obtaining a liquor license and stated that Exprezit would only need to have a minimal net worth of $395,000 in order to obtain bonding.

---

other rights or defenses provided by common law or statutory law in regard to contracts." Id.

19

3T has leveled a bevy of arguments which it claims entitle it to judgment on Exprezit's misrepresentation claim. 3T claims that because of the integration clause contained in the Agreement, Exprezit's misrepresentation claim fails as a matter of law. As 3T correctly notes, parol evidence may not be used to contradict the terms of a written contract. "Significantly, the parol evidence rule does not apply to allegations of fraudulent misrepresentation inducing a party to enter a contract because under Tennessee law, promissory fraud sounds in tort, not in contract." <u>Shah v. Racetrac Petroleum Co.</u>, 338 F.3d 557, 567 (6th Cir. 2003). Moreover, "Tennessee law 'does not require ambiguity when certain defects in the formation of the agreement are demonstrated; parol evidence can be admitted to contradict or vary the terms or enlarge or diminish the obligation of a written instrument upon a showing of fraud." <u>Id</u>.

In any event, the representations alleged by Exprezit do not necessarily contradict the express terms of the Agreement between the parties. The promised refund by Keith if "for ANY reason" Exprezit did not become bonded is not inconsistent with the First Amendment's language that "Exprezit will not be bound to the terms of this Contract unless it is approved as a licensed and bonded Money Transmitter" in which case "Exprezit will be reimbursed its initial payment," or the Second Amendment's language that "if Exprezit Money Orders is not approved as a licensed and bonded

20

Money Transmitter . . . then Vendor shall refund . . . the initial payment within 30 days[.]"  Instead, this evidence may be used to illustrate the parties' intent in entering into the Agreement and Amendments.  Likewise, the other representations relating to the supposed benefits and ease of the process and the modest financial requirements for licensing and bonding do not necessarily contradict the language of the written agreement.

In a one-paragraph argument 3T next claims that Exprezit cannot establish the essential elements of misrepresentation because "plaintiff could not reasonably have relied upon any representation not contained in the parties' written agreements in light of the integration clause[.]" (Docket Entry No. 81 at 22).  This argument must be rejected.  "Despite Defendant's assertion otherwise, there is no rule that a merger clause makes reliance on oral representations unreasonable *per se* so as to necessarily defeat a fraudulent inducement or promissory fraud claim." <u>Shah</u>, 338 F.3d at 568.  "[N]othing suggests the Tennessee judiciary has either adopted or would adopt a *per se* rule that an integration clause makes it <u>always</u> unreasonable to rely on prior oral representations." <u>Id</u>. (emphasis in original).[9]

_____

[9]While the Tennessee Court of Appeals held in <u>Johnson v. Allison</u>, 2004 WL 2266796 (Tenn. Ct. App. 2004) that an integration clause within a contract made reliance on oral statements unreasonable, it did not, as 3T appears to suggest, abrogate the notion that there is no *per se* rule barring such testimony where there is a claim for fraud in the inducement.  In fact, the court focused on the facts before it and even observed that while the

21

Finally in regard to misrepresentation, 3T asserts this claim should be dismissed because of the economic loss doctrine. The economic loss doctrine provides that "'[i]n a contract for the sale of goods where the only damages alleged come under the heading of economic losses, the rights and obligations of the buyer and seller are governed exclusively by the contract.'" <u>Messer Grieshan Indus. Inc. v. Eastman Chem Co.</u>, 194 S.W.3d 466, 471 (Tenn. Ct. App. 2005)(citation omitted). Exprezit argues this doctrine is inapplicable given its misrepresentation/fraud in the inducement claim.

The parties have cited and the Court has found no Tennessee cases which hold that the economic loss doctrine bars a fraud in the inducement claim. Other courts have repeatedly held that fraud in the inducement is an exception to the economic loss doctrine. See, <u>Alternative Aviation Serv. Inc. v. Meggit (UK) Ltd.</u>, 2006 WL 3794329 at *6 (6th Cir. 2006)(applying Michigan law); <u>Marvin Lumber and Cedar Co. v. PPG Indus. Inc.</u>, 223 F.3d 873, 885 (8th Cir. 2000)(Minnesota law); <u>Kaloti Enterprises, Inc. v. Kellog Sales Co.</u>, 699 S.W.2d 205, 206 (Wis. 2006)(Wisconsin law); <u>D & M Jupiter, Inc. v. Friedopfer</u>, 853 So.2d 485, 487 (Fl. App. 2003)(Florida law); <u>Cocchiola Paving, Inc. v. Peterbilt</u>, 2003 WL 1227557 at *5 (Conn.

_____

parol evidence rule bars outside evidence to vary or explain the terms of a written contract, "[t]here is an exception for situations where it can be proven that the written terms do not accurately reflect the intentions of the parties at the time of their contracting." <u>Id</u>. at *9.

Super. 2003)(Connecticut law). Given that a fraud in the inducement claim presents a special situation where parties to a contract appear to negotiate freely - which normally would constitute grounds for invoking the economic loss doctrine - but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior, the Court concludes that the economic loss doctrine would not bar Exprezit's misrepresentation claim.

**4. <u>Tennessee Consumer Protection Act Claim</u>**

The TCPA protects consumers who suffer a loss due to "unfair or deceptive acts or practices" and proscribes "representing that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve." T.C.A. § 47-18-104(12). The TCPA also prohibits "engaging in any other act or practice which is deceptive to the consumer or to any other person." T.C.A. § 47-28-204(27).

Relying on the argument it makes in support of dismissal of the misrepresentation claim, 3T moves for summary judgment on the TCPA claim because it alleges Exprezit cannot show unfair or deceptive practices. However, when the facts are construed in favor of Exprezit, a jury could conclude that 3T represented it would refund the down payment if Exprezit did not become licensed or bonded for any reason, but refused to do so. Further, a jury could conclude that 3T also made factual representations which

23

proved to be deceptive relating to the ease by which Exprezit could become bonded and what would be required in order to become bonded. Accordingly, summary judgment is not appropriate on the TCPA claim.

## IV.  CONCLUSION

For the foregoing reasons, the Motion for Partial Summary Judgment (Docket Entry No. 75) filed by Plaintiffs will be denied. The Motion for Partial Summary Judgment (Docket Entry No. 72) filed by Defendant/Counterplaintiff will also be denied.

An appropriate Order will be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE